# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | | |
|---|---|---|
| **CHIP RHEA EAKINS** | * | **CIVIL ACTION NO.  15-2186** |
| **VERSUS** | * | **JUDGE ELIZABETH E. FOOTE** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Chip Rhea Eakins filed the instant application for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments on May 30 and June 13, 2012, respectively.  (Tr. 148-153).  He alleged disability as of February 15, 2012, because of osteoarthritis of the neck, shoulder, lower back and knees; knee injury; depression; anxiety; and "back problems."  (Tr. 167, 171).  The state agency denied the claims initially and upon reconsideration.  (Tr. 89-92, 95-102, 105-110).  Thereafter, Eakins requested and received a November 1, 2013, hearing before an Administrative Law Judge ("ALJ").  (Tr. 51-82).  However, in a March 14, 2014, written decision, the ALJ determined that Eakins was not disabled under the Social Security Act, finding at step five of the sequential evaluation process

that he was able to make an adjustment to work that exists in substantial numbers in the national economy.  (Tr. 25-44).  Eakins appealed the adverse decision to the Appeals Council.  On June 23, 2015, however, the Appeals Council denied Eakins' request for review; thus the ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).

On August 14, 2015, Eakins sought review before this court.  Succinctly restated, he contends that, for various reasons, the ALJ's residual functional capacity assessment is not supported by substantial evidence.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

2

**Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

> (1)   An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

> (2)   An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

> (3)   An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

> (4)   If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

3

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### ALJ's Findings

## I.     Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant had not engaged in substantial gainful activity during the relevant period.  (Tr. 30).  At step two, he found that the claimant suffers severe impairments of degenerative disc disease and osteoarthritis of the lumbar and cervical spine; degenerative joint disease of the left knee and right shoulder; obesity; panic disorder with agoraphobia; major depressive disorder; and pain disorder with psychological factors.  (Tr. 30-31).[1]  He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  (Tr. 31-33).

---

[1]  He also found that Eakins' history of carpal tunnel syndrome impairment to be non-severe.  *Id*.

4

## II.     Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity

("RFC") to perform light work,[2] except that he can sit for 4 hours during an 8-hour workday;

walk and/or stand up to 4 hours in an 8-hour workday; unable to reach overhead with the right

upper extremity; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs,

balance, stoop, kneel, crouch, and crawl; able to understand, remember, and carry out simple

instructions and tasks; "tolerate" occasional contact with the public and frequent contact with co-

workers and supervisors; able to adapt to workplace changes that are no more than occasional

and gradually introduced; and cannot perform strict quota-based work.  (Tr. 33-42).

## III.    Steps Four and Five

The ALJ concluded at step four of the sequential evaluation process that the claimant was

unable to perform his past relevant work.  (Tr. 42).  Accordingly, he proceeded to step five.  At

this step, the ALJ determined that the claimant was an individual closely approaching advanced

age, with a high school education, and the ability to communicate in English.  *Id*.  Transferability

of skills was not material to the determination of disability.  *Id*.

---

[2]  Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even though the
> weight lifted may be very little, a job is in this category when it
> requires a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling of arm or
> leg controls.  To be considered capable of performing a full or wide
> range of light work, you must have the ability to do substantially
> all of these activities.  If someone can do light work, we determine
> that he or she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine dexterity or inability
> to sit for long periods of time.

20 C.F.R. § 404.1567(b).

The ALJ then observed that given the claimant's vocational factors, and if he had an RFC that did not include any non-exertional limitations, the Medical-Vocational Guidelines would direct a finding of not disabled.  20 C.F.R. § 404.1569; Rules 202.14, Table 2, Appendix 2, Subpart P, Regulations No. 4.  (Tr. 42-43).

However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent the additional limitations eroded the occupational base for light work.  *Id*.  In response, the VE identified the representative jobs of parking lot cashier – light, *Dictionary of Occupational Titles* ("DOT") Code # 211.462-010; bakery line worker – light, DOT Code # 524.687-022; and fruit distributor, DOT # 921.685-046, that were consistent with the ALJ's RFC and the claimant's vocational profile.  *Id*.[3]

### Analysis

I.    **RFC**

a)    Non-Exhaustive Chronology of Relevant Medical Evidence

Eakins underwent left and right carpal tunnel release in 2004 and 2005.  (Tr. 472-477).

On June 16, 2006, neurologist, Richard Hubbard, M.D., noted that there did not appear to be anything on an EMG or CT scan that appeared to represent a neurological problem.  (Tr. 496).  Although Eakins had a narrow spinal canal, he did not have radiculopathy.  *Id*.  Aside from his

---

[3]  The VE testified that for the parking lot cashier job, there were 80,000 positions nationally and 7,000 positions regionally.  (Tr. 43, 79).  For the bakery line worker job, there were 46,000 positions nationally and 2,500 regionally.  *Id*.  For the fruit distributor job, there were 34,000 positions nationally and 2,900 positions regionally.  *Id*.  This incidence of work constitutes a significant number of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

back pain and use of a walking cane, he appeared to be an extremely healthy looking person.  *Id.*
Dr. Hubbard noted that this suggested that there was something else going on, rather than what
"they" were looking for.  *Id.*

From 2007 until 2012, Eakins received treatment for various conditions at the office of
Jose Cavazos, M.D.  *See* Tr. 279-306.[4]

A June 7, 2011, x-ray of the lumbar spine revealed osteoarthritis of the facet joints and
lumbar spondylosis.  (Tr. 276).

On October 10, 2011, Eakins complained of severe back pain.  (Tr. 281).

An October 12, 2011, lumbar MRI revealed small tears in the posterior aspect of the
annulus fibrosus at L2-L-3 and L-3-L-4 discs.  (Tr. 274).  There also was slight bulging of the
discs, and very early degenerative changes of the lumbar spine.  *Id.*

On November 17, 2011, Eakins was seen by neurosurgeon, Donald Hilton, M.D.  (Tr.
273).  At that time, Eakins complained of significant pain in the lumbar spine and left lower
extremity that went down into his buttock and his left leg.  *Id.*  His pain was worsening.  *Id*
Hilton recommended MITR procedure (minimally invasive tubular retractor), left L5-S1.  *Id.*

On November 30, 2011, Eakins underwent a left lumbar L5-S1 partial hemilaminectomy,
foraminotomy with decompression of left S1 root with minimally invasive tubular retractor.  (Tr.
277-278).

On January 2, 2012, Eakins reported to his physician that he had been depressed for the
past two months.  (Tr. 287).

On May 29, 2012, Eakins went to the emergency room with complaints of right shoulder

---

[4]  His treatment notes, however, are handwritten and difficult to decipher.

7

pain and swelling that had started about three months earlier.  (Tr. 311-315).  He rated his pain as an 8/10 that was exacerbated by movement.  *Id*.

A May 29, 2012, x-ray of the right shoulder showed prominent subacromial osteophytosis possibly associated with impingement syndrome.  (Tr. 316).  There also was mild inferior osteophytosis at the AC joint.  *Id*.

A May 29, 2012, CT scan of the cervical spine showed near complete loss of disc space at C5-C6.  (Tr. 317).  There also was moderate degenerative disc disease and spondylosis at C4-C5, C6-C7, and C7-T1.  *Id*.

On June 4, 2012, Eakins was seen by family practitioner, Vern Ellis, M.D., for a check-up.  (Tr. 322).  Eakins complained of neck, shoulder, and bilateral knee pain.  *Id*.

On July 12, 2012, Vern Ellis completed a mental status report in which he indicated that Eakins essentially was normal, with good ability to relate to others, sustain work, and respond to changes/stress in the work setting.  (Tr. 364).

An August 9, 2012, examination by Dr. Ellis slowed that plaintiff had lumbar spine pain with decreased range of motion.  (Tr. 432-434).  He also had right shoulder pain, and hand/wrist pain.  *Id*.

On August 13, 2012, Ellis completed a medical opinion questionnaire wherein he noted that Eakins suffered from lumbar and cervical disc protrusion, depression, and anxiety.  (Tr. 366-368).  He opined that Eakins could walk one city block without rest, continuously sit for ten minutes and stand for twenty minutes.  *Id*.  He also could sit for a total of less than two hours in an eight hour day and stand/walk for a total of about two hours.  *Id*.  He required a sit/stand option, with the need for six unscheduled breaks during an eight hour work day.  *Id*.  Ellis further opined that while standing/walking, Eakins should use a cane.  *Id*.  He could never lift any weight

at all.  *Id*.  Moreover, he would miss more than two days of work per month.  *Id*.

On, or about August 13, 2012, Dr. Ellis also completed a more-detailed mental impairment medical opinion questionnaire in which he found that Eakins had no useful ability in many areas of functioning.  (Tr. 369-371).

A September 21, 2012, examination by Dr. Ellis showed full range of motion of the extremities.  (Tr. 421-423).  Ellis further documented that Eakins experienced only "discomfort" in his cervical and lumbar spine.  *Id*.  In fact, his notes reflect that Eakins' muscular pain and back pain had resolved.  (Tr. 423).

On September 26, 2012, at the request of the state agency, Eakins was seen by consultative psychologist, Betty Eitel, Ph.D.  (Tr. 374-378).  Upon arrival, Eakins' gait was slow and steady with a slight limp.  *Id*.  He reported that he sometimes had to use a cane, but it depended on the pain.  *Id*.  He explained that there never was a day where he did not hurt.  *Id*.  He disclosed that he suffered from panic attacks.  *Id*.  He had gained 40 pounds in the past six months.  *Id*.  He experienced depression at least five out of seven days per week.  *Id*.  He disclosed that he had had suicidal thoughts within the last couple of weeks.  *Id*.  Sometimes, he would arise in the middle of the night and do yard work.  *Id*.  He also could do housework, but neglected chores due to depression.  *Id*.  He was able to complete all personal hygiene tasks independently, but neglected to do so due to depression.  *Id*.  He admitted that he had smoked marijuana once and tried cocaine once.  *Id*.

Dr. Eitel noted that Eakins was very talkative.  *Id*.  His ability to encode and retain material appeared slightly impaired, as was his concentration.  *Id*.  His abstract reasoning was in the normal range.  *Id*.  Eitel diagnosed panic disorder with agoraphobia; major depressive disorder, recurrent, severe without psychotic features; and pain disorder associated with both

9

psychological factors and spinal stenosis.  *Id*.  She assigned a Global Assessment of Functioning ("GAF") score of 40.  *Id*.[5]

On October 9, 2012, non-examining agency psychologist, Lee Wallace, Ph.D., completed a psychiatric review technique in which he indicated that plaintiff had moderate limitations of functioning.  (Tr. 379-391).  He further noted that the low GAF score recorded by Dr. Eitel was not supported by the "EOR."  *Id*.

Dr. Wallace also completed a mental RFC, opining that Eakins had marked limitations in his ability to understand, remember, and carry-out detailed instructions.  (Tr. 401-404). Furthermore, he experienced moderate limitations in his ability to:  remember locations and work-like procedures, maintain concentration for extended periods, perform activities within a schedule, sustain an ordinary routine without supervision, work in coordination with or proximity to others without being distracted, complete a normal workweek without interruptions from psychologically-based symptoms, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them, respond appropriately to changes in the work setting, travel in unfamiliar places, and to set realistic goals.  *Id*.[6]

On October 10, 2012, non-examining agency physician, Hajra Madani, M.D., completed

---

[5]  "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'"  *Boyd*, 239 F.3d at 701 n.2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)).  A GAF score of 31-40 denotes "**[s]ome impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work . . .).  DSM-IV, pg. 32.

[6]  On December 12, 2012, non-examining agency phychologist, Mark Schade, Ph.D., reviewed the file and affirmed the prior findings.  (Tr. 435).

a physical residual functional capacity assessment form that was all but consistent with the full range of light work.  (Tr. 393-400).  Madani further noted that there was no recent prescription for a cane, and no mention of cane use.  *Id.*

On December 12, 2012, non-examining agency physician, Tina Ward, M.D., affirmed the prior findings.  (Tr. 436).  She noted that on November 11, 2012, Eakins exhibited a full range of motion in his extremities, with no tenderness or joint deformities, and no swelling.  *Id*.  His back had a full range of motion, without tenderness.  *Id.*

Eakins returned to Dr. Ellis on December 13, 2012, for follow-up.  (Tr. 442-444).  Upon examination, his back and extremities were normal.  *Id.*

Plaintiff saw Carlos Japas, M.D., on December 17, 2012.  (Tr. 626-627).  He had left knee tenderness, but otherwise normal range of motion in his back and upper limbs.  *Id*.  He hurt his neck in a 2006 car accident.  *Id.*  Japas diagnosed diabetes mellitus, reflux esophagitis, hypertension, hyperlipidemia, anxiety, depression, generalized osteoarthritis, and obesity.  *Id*.

On January 10, 2013, Eakins was seen by Elvin Adams, M.D., for complaints regarding his knee, foot, cervical fusion, degenerative disc disease, lumbar surgery, bone spurs, bulging disc, blood sugar, depression, and anxiety.  (Tr. 624-625).  Eakins reported that he had undergone six surgeries on his left knee.  *Id*.  Adams diagnosed hyperlipidemia, diabetes mellitus type II, chronic lumbar disease, chronic degenerative changes in the left knee, and mild obesity.  *Id.*

On April 4, 2013, Dr. Adams noted that Eakins was on ten different medications, and that he mainly was followed for diabetes.  (Tr. 622-623).  He was exercising a lot, and had lost 15 pounds.  *Id.*  He "ran" his mother around to various places for her care.  *Id.*  Upon examination, Eakins' lower extremities exhibited a normal range of motion with no deformity, lesion, swelling, tenderness or wasting.  *Id.*

11

Eakins returned to Dr. Adams on May 9, 2013.  (Tr. 620-621).  He reported constant moderate neck pain that radiated to his arms and hands creating numbness.  *Id*.  His diabetes was controlled with oral agents.  *Id*.  He had lost 11 pounds, and exercised by riding a bicycle, which was comfortable for him.  *Id*.  In fact, he could ride a bike for hours at a time without significant pain.  *Id*.  Eakins reported that he was seeking disability because of his knee and other medical problems.  *Id*.

A May 10, 2013, x-ray of the left knee showed severe osteoarthritis.  (Tr. 634).

Eakins next saw Dr. Adams on July 25, 2013.  (Tr. 618-619).  He reported that when he sat and used a keyboard, both of his arms gradually developed severe pain after about 20 minutes, thus requiring him to change position by standing and hanging his arms down.  *Id*.  His low back pain was worse with sitting, but sporadic.  *Id*.  He reported chronic back pain, with radiation down one or both legs, at times.  *Id*.  He was unable to bend his back much without severe back pain.  *Id*.  He took hydrocodone when the pain became severe.  *Id*.  His knee pain was constant, left worse than right, but improved with rest.  *Id*.  He was unable to climb stairs or ladders, and unable to repeatedly bend his knee.  *Id*.  He had moderate anxiety that was worse with socialization and travel.  *Id*.  His depression was moderate and improved with medication. *Id*.  Review of systems included diabetes type II, but no assessment of same.  *Id*.

On July 25, 2013, Dr. Adams completed an attorney-supplied medical opinion questionnaire.  (Tr. 485-486).  He indicated that Eakins could walk one to two city blocks before needing to rest.  *Id*.  He continuously could sit and/or stand for 20 minutes at a time, and sit, stand, and/or walk for a total of less than two hours in an eight hour work day.  *Id*.  He needed a sit/stand option.  *Id*.  He also needed to take unscheduled work breaks every 20 minutes.  *Id*.  He required use of a cane.  *Id*.  He could lift less than ten pounds on an occasional basis, but never

12

reach overhead.  *Id.*  He needed to avoid temperature extremes, cigarette smoke, and solvents/cleaners.  *Id.*  He occasionally could twist his torso, but never stoop (bend), crouch, or climb stairs/ladders.  *Id.*

On October 29, 2013, Dr. Adams dutifully completed a series of *six* attorney-provided questionnaires that were tailored to the effects of Eakins' varied impairments; they addressed such areas as, the Cervical Spine, Lumbar Spine, Manipulative Limitations, Ability to do Physical Activities, Diabetes Mellitus, and Arthritis.  (Tr. 640-664).  Dr. Adams endeavored to answer the questionnaires uniformly, regardless of the specific impairments.  *Id.*  For example, he consistently opined that Eakins continuously could sit for two hours at a time and stand for about ten to fifteen minutes.  *Id.*  He also could sit for a total of about four hours in an eight hour work day and stand/walk for less than two hours.  *Id.*  Eakins required a sit/stand option with hourly breaks.  *Id.*  He also needed to elevate his leg about two feet.  *Id.*  He required use of a cane, and frequently could lift less than ten pounds and occasionally lift ten pounds.  *Id.*  Eakins, however, could never stoop (bend), crouch, climb stairs and ladders.  *Id.*  He also would need to miss work more than twice per month.  *Id.*

b)      Discussion

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, plaintiff's activities of daily living, treatment records, the impressions of plaintiff's treating physicians, the consultative psychologist, and the assessments of the non-examining agency physicians and psychologists.  (Tr. 33-42).  In deriving plaintiff's RFC, the ALJ resolved the opinion evidence as follows,

> [t]he opinions of Dr. Adams . . . are afforded little weight because his treatment notes do not support his extreme limitations.  Further, Dr. Adams' opinions are not consistent with other evidence in the record discussed herein, including DDS evaluations.  Additionally, Dr. Adams' opinion . . . that the claimant is incapable

13

of performing even "low stress jobs" is afforded little weight because the opinion is outside Dr. Adams' specialty and is vague . . .

Dr. Ellis offered opinions suggesting that the claimant was limited to less than sedentary and mentally incapable of working.  However . . . Dr. Ellis completed another MRFC just one month earlier, in which he opined that the claimant had no mental health issues and her [sic] symptoms were "normal."  Thus, because Dr. Ellis' opinions are inconsistent and there is no intervening event indicating that the claimant's symptoms worsened between the first and second opinions, Dr. Ellis's opinions are assigned no weight in assessing the claimant's residual functional capacity.

(Tr. 40-41).

The ALJ also documented the consultative psychologist's finding that Eakins had a GAF of 40, but discounted its significance on the twin grounds that a GAF score is not intended for forensic purposes, and, in any event, represents no more than a brief snapshot of a claimant's condition. (Tr. 42).

In lieu of the opinions of the treating physicians and the consultative psychologist, the ALJ assigned "considerable, but not great" weight to the assessments of the non-examining agency physicians and psychologists.  (Tr. 41).

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence, *inter alia*, because he declined to adopt the opinions of the treating physicians.  Ordinarily, a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence."  20 C.F.R. § 404.1527(d)(2).  "'[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'"  *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted).  However, an ALJ cannot reject a medical opinion without an explanation

14

supported by good cause.  *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

The ALJ discounted the opinions of Eakins' treating physicians, in part, because they conflicted with the findings of the non-examining agency physicians.  However, a non-examining physician/psychologist's opinion does not provide good cause for an ALJ to discount the findings of an examining physician.  *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (addressing ALJ's reliance upon non-examining physician's opinion to discount findings of treating physician).[7]  Moreover, "an ALJ may properly rely on a non-examining physician's assessment when . . . those findings are based upon a careful evaluation of the medical evidence and *do not contradict those of the examining physician*." *Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir.1991) (quoting *Villa, supra*) (emphasis added).  Here, the non-examining physicians' assessments were not congruous with those of the examining physicians, and therefore, do not provide grounds to support the ALJ's decision.[8]

Relatedly, the Fifth Circuit has remarked that, "*absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the

---

[7]  The Fifth Circuit cited *Lamb* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician." *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990) (citing, *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).  Indeed,

[8]  In addition, although the ALJ endeavored to undercut the significance of Dr. Eitel's GAF score on the basis that GAF scores are not intended for forensic purposes and only represent a snapshot of the claimant's condition, the severity of the assessment remains at odds with the largely moderate limitations of functioning endorsed by the non-examining psychologists.

15

treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis added).  In this case, there was no other evidence from a treating or examining physician that controverted the impressions of plaintiff's treating physicians.  Thus, the ALJ was obliged to address each of the § 404.1527(d)(2) (now § 404.1527(c)) factors.  This, he did not do.[9]

Finally, the court observes that the ALJ ultimately assessed greater limitation of functioning than the agency physicians on the basis of new records produced at the hearing, which were not available to the agency physicians.  (Tr. 41).[10]  In effect, the ALJ acknowledged that the more recent records undermined the assessment of the agency physicians.  He then proceeded to issue his own assessment based on those records, notwithstanding the contrary evaluations of that same evidence by plaintiff's treating physicians.  In so doing, he overstepped his role.

In sum, the court finds that the ALJ did not provide good cause for discounting the opinions of the treating/examining physicians/psychologist.  Furthermore, his residual functional capacity assessment otherwise is not supported by substantial evidence.

## II.    Step Five and Remand

Because the foundation for the ALJ's step five determination was premised upon an RFC

---

[9]  Plaintiff alternatively contends that the ALJ was obliged to re-contact his treating physicians.  *See Newton, supra* (citing 20 C.F.R. § 404.1512(e)).  In 2012, however, the regulations were amended, and now the Commissioner *may* recontact a medical source if she is unable to render a decision because the evidence is insufficient or inconsistent.  20 C.F.R. § 404.1520b (2016).

[10]  The records included plaintiff's progress notes from his treating physicians.  *See* Tr. 54, 616-639.

that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled, likewise is not supported by substantial evidence.

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  42 U.S.C. §405(g).  When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.  *See Ferguson v. Heckler*,  750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits).  The instant record is not so disposed.  Plaintiff's residual functional capacity assessment remains indeterminate.

## Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.[11]

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written

---

[11] The court need not consider plaintiff's additional arguments.  These issues may be addressed upon remand.

objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before a final ruling issues.

      **A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

      In Chambers, at Monroe, Louisiana, this 6th day of December 2016.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE